Before we start, the Zoom is all set up for the appellee, is that right? We're good? Okay, great. Mr. Bergstein. Yes. Good morning. Stephen Bergstein for the Plaintiff Appellant. The plaintiff was entitled to judgment as a matter of law on his reasonable accommodation claim. And in the alternative, the plaintiff was entitled to a new trial because of evidentiary errors and the weight of the evidence in the plaintiff's favor. Let me start with the reasonable accommodation on the merits. The plaintiff proposed a reasonable accommodation as a matter of law when his attorney and his doctor sought a six-month medical leave. So the plaintiff had time to ameliorate certain life impairments from various disorders. So, Counselor, can you tell me, is it your position that they are required to accept the accommodation that was put forward? Or did your client have an obligation to engage in an interactive process? Well, the medical school was required to follow the plaintiff's proposed accommodation if they don't have anything that's reasonable in response. And they didn't. And this is where we get into the interactive process. The medical school did not engage in the interactive process in good faith for a couple of reasons. First, on October...  Did you ever explain, though, that the proposal was unworkable? My understanding is that there was no response, and then that you filed. Is that right? Does the institution know that you didn't think it was reasonable, or did they hear about it in papers? They had to know it wasn't workable because the proposal from the medical school was not in compliance with the testing company's deadlines. It wasn't in compliance because, given that the testing company has this policy of not taking the one exam more than three times in a year, the earliest he could take it was December, and then it would be hard to get the scores by the end of January, right? Correct. Is there any reason to think that if he had pointed that out to the lawyer for the school, that they would have responded by saying, oh, okay, so then maybe we'll extend the deadline by a little bit? There's reason to think if that was brought to the school's attention contemporaneously, they would have stood firm on the... So, but why is that? I mean, we have, even in the record, emails from, I guess the lawyer is Thompson, in February, which is after the deadline, in which he says, do you have an update on getting an accommodation? We still haven't, we haven't expelled your client. We're going to work with you, right? Because as late as June of 2014, after this process had played out and plaintiffs had filed a civil rights complaint with the Office of Civil Rights and laying out the unworkability of the deadline, the dean, and this is page 1362 of the record, Plaintiff's Exhibit 56, they still held firm to the framework set out in the October 21st letter from Jordan Thompson. This is six months... But they haven't expelled him yet, right? He's still, to this day, not expelled. Is that correct? I don't think that can be true, and I'll tell you why. They have a six-year limit on how long you can remain matriculated at the medical school. They can say whatever they want. He hasn't been expelled. Under their rules, you have six years. And the six years... I mean, has he been expelled? Has he been given notice that he's been expelled? Like a formal notice? Nothing that I saw on the record, but they can't keep him in the program forever. And we're talking 15 years. He joined in 2008, and you have a six-year window to graduate and get everything done. And that's long behind us. Well, how does that cut not against your client? He's also had that time, presumably, to get the accommodations and take the test, right? But he's no longer matriculated at the medical school under the six-year rule. And the source for that is... So maybe if I may ask the question a different way. My understanding... I mean, there's arguments to be made, but my understanding is that you have to show us that no reasonable juror could have reached any of three possible conclusions. One is that NYIT's proposed accommodation was reasonable. The other was that your client didn't engage in an interactive process. And then the third is that your own client's proposed accommodation was unreasonable. So if you could point to me what you think is the best piece of evidence that was before the jury that would have made any one of those three, or all three of these pathways, such that no reasonable juror could have found. Okay. October 21, 2013, the medical school's attorney, Jordan Thompson, proposes you have to pass the exam. We have notice of that by January 31. That's impossible because it takes 8 to 10 weeks from the date of the exam for the results to come in, and he's not eligible to sit until December 26. So which one is that? Is that that their proposal was unreasonable, or is it that you engage in an interactive process? What does that piece do? Which pathway do you think it forecloses? Well, it shows that their proposal was unreasonable and unworkable, and it shows their failure to comply with the interactive process because their response was not workable. But apart from that, apart from that, they also conditioned. Isn't that what an interactive process is? So if the school responds by saying, well, actually we would like you to get an accommodation and get us scores by the end of January, if there's a reason why that's not workable, isn't that why we have interactive process? The idea is that the person seeking the accommodation should respond by explaining why it's unworkable? Let me answer it this way. When they resumed communicating in January, the school held firm on another condition. In addition to January 31st, and the letter was January 31st, but in addition to the January 31st deadline, they continued to condition his eligibility for taking the exam on getting a testing accommodation from the end. Well, why was that unreasonable? So he had taken the test a number of times and not passed. In fact, his score was in the 200s, whereas the passing score is a 400. So why wouldn't it be reasonable for the school to say, well, we'll give you more time to do it again, but you have to do it with an accommodation because we don't really have any indication that you'll be able to pass without an accommodation. Because they knew he was never going to get a testing accommodation from the test. Why would that be? Because the testing company that year, in 2013, had already twice requested his request for a testing accommodation. Rejected, but then there was a give us, he says, I've got more information, and they seemed to welcome that update of information, but he never sends it. He couldn't have provided any better information than he did when he sought the accommodations in 2013 because he had a lengthy report from Dr. Yellen about his reading comprehension, how it relates to his disabilities. He couldn't improve on that. So the medical school. He didn't have some of those documents, right, before the two first requests for the accommodation were lacking certain documents, right? And he could presumably have gotten them. But he couldn't have improved on that is what we're saying, and they knew he wasn't going to get. I mean, even if he could, so we have this question about, well, maybe he could have, I don't know, maybe a jury could have thought that he could still get the accommodation. But even if it was unlikely that the testing organization was going to give him an accommodation, why wouldn't it still be reasonable for the school to say, you've taken it a number of times without a testing accommodation. We don't think you'll be able to pass without an accommodation, so we'll give you another period of time to study and take it again, as long as you get some kind of accommodation that will give us some confidence that you'd have a shot at passing it. Well, he had passed his other exams with the medical school. But he had done that before he engaged in trying to pass the COMEX, too, right? He had passed all of those exams before. The other problem with the testing condition is that it takes about 8 to 10 weeks to get an answer from the Indiana testing company when you're seeking this type of accommodation. We know that because that's the timeline that was relevant to his 2013. Yeah, so that's back to this idea that the deadline of the end of January might have been too short, either to get the accommodation or to get the school report to the school by the end of January. But that, again, that's those policies, and it doesn't seem like he ever said, I don't think I can make that deadline. It was in the OCR, the Office of Civil Rights complaint, that his attorney filed about the workability of the deadlines in January. If we're talking about the iterative process between the person seeking the accommodation and the school, wouldn't there have to be a communication with the school? On what? On the unworkability of the deadline. I guess just to go more directly, I mean, why couldn't a reasonable jury have said, all right, look, they made this – he made an offer, they made an offer, then he stopped talking and decided to sue. But, you know, I think that the school wasn't done negotiating, and so he's the one who broke off the discussion. Well, the school was never going to budge off the January 31st deadline. I'm not sure on that point you're responding to Judge Menasche's earlier question about the February 2014 email communication, notifying that it wasn't – it didn't dismiss him yet and asking about his process. I mean, that seems to suggest an openness to negotiation at that point. But there wasn't going to – In fact, it means they didn't budge, right, because they had not expelled him by the end of January. There wasn't going to be an openness to negotiation, because even after the OCR complaint laid out the unworkability of the timeline – I'm going to ask the question another way. Like, you're making an argument that may or may not have some power, but what we need to do is figure out why was it – why would it not have been possible for a reasonable juror to conclude that they weren't done? Like, and it sounds to me like you're, again, making the argument, but, like, those were all arguments that the jury heard, and so if you have something that you think is going to persuade us, then – Because in the January 31st letter from Thompson, he held firm on the original timeline, and they did so again in June, and second, they continued to condition it on getting a testing accommodation that they knew he wasn't going to get. They know he's not getting a testing accommodation. Therefore, he's not eligible to sit for the exam. When we talk about interactive process, we look at whether it was a good faith process, and we know from their witness testimony, Thompson could not recall if anyone even analyzed whether the January 31st framework was workable under the testing company's rules, because no one really looked at it. No one – he couldn't recall the timeframes for the MBL-ME guidelines. The assistant dean testified she wasn't sure that Planoff even was seeking a disability accommodation or whether he just wanted to study. I mean, they were not – they did not believe he really needed this. I mean, all of those things seem precisely the result of the ending of communication by your client. But these beliefs I'm describing to you were before – were during the process. They didn't think he really needed a disability accommodation in the first place. That was in the letter from Jordan Thompson to Planoff's lawyer, because we don't think a reasonable accommodation is warranted, but let's lay out this framework. Well, we're allowed to say that, right? I mean, the letter says we don't think that he's entitled to an accommodation. Nevertheless, we are providing an accommodation that we think is reasonable. But you have three or four lines of testimony from their witnesses that raise questions whether they really thought in good faith he even needed an accommodation. You reserved time for rebuttal, so we'll hear from you again. Thank you. Let's turn to the athlete, Mr. Catalino. Thank you for your courtesies, including this Zoom. The facts are not disputed. Mr. Ball postponed the test 20 times, failed the test five times. In September of 2013, he was obligated to pass the test. Of course, he did not.  Because he wanted money from a juror rather than get a degree. We, now it's September of 2013, but in August, on August 19, 2013, he asked Dr. Radler to request a medical leave of absence. He's already on a leave of absence to take the complex. He was already on a leave of absence for directed study. We gave him an additional capstone, all in our repeated efforts to get him to graduate. Not to fail him, to graduate him. Now it's August, and I get exercised when I continue to see this misstatement in the record that we gave him an offer of a three-month accommodation. It's August 19, 2013, when Adler writes his letter. Thompson writes back, okay, you got until January 31, 2014. That's five and a half months, not three months. Secondly, this court must... Wait, sorry, isn't the letter from Thompson October 2013? Yes, yes, but he had asked for this leave of absence on August 19, incidentally. So you're saying that the October letter should be understood in light of leave of absence that was continuing up until that time? Yes, and we never terminated him. He has withdrawn. This was unilateral on our part to get him to graduate and get a degree. He did not come up with the concept. In January of 2014, since he's bent on suing, there is no Gorin. There is no Mulhern. There is not his third lawyer. There is no more Adler. Adler never did an assessment, never did an assessment of his alleged medical needs. What this was all was a setup to sue NYIT. And here we are 12 years later. I have a question. Would it, in fact, have been impossible between October and January 31 for him to have gotten an accommodation, taken an exam, and gotten the results by January 31, 2014? No. Can you explain to me why it was not? What facts are there? He never went to NBOA meeting. And what's particularly startling about this is that counsel suggests that we conditioned him passing the test on his taking an accommodation from NBOA meeting. That's what he wanted. He wanted that. And we said, fine, if you get your accommodation from NBOA meeting to take the test for twice the length of time. Why did your accommodation need to be contingent on the NBOE? It wasn't contingent. And, in fact, after January 31, 2014, we said, go take the test. Please ask counsel, why didn't he take the test through today 12 years later? It had nothing to do with NYIT. It's like you don't pass the bar exam. I guess I understand your argument about the lead time before the October 2013 letter. And so maybe we should think about the time horizon as a longer period of time. But if we understood the letter on its own terms, isn't it right that because of the NBOE policy, he couldn't take the exam until the end of December, and then so he couldn't have had a score reported by the end of January? He could have gone to NBOME in August and sought reconsideration. He did not discuss this with them. There is no evidence in the record. What's the consideration, an exemption from the three times a year policy? Yes, or otherwise. He did not reach out to NBOME. He didn't want to take the test, Judge. He hasn't 12 years. We withdrew him unilaterally. So he could. You keep saying he didn't want to take the test. I guess what part of the – what's the import of that? So does that mean he didn't have to provide a reasonable accommodation because he didn't really want to take the test, or it was reasonable because he didn't intend – how does that fit into the question before the jury? Because of the suggestion that NYIT has somehow offered him an unreasonable accommodation when it's done everything in its power to grant him any accommodation that he desired, plus more, including, of course, the extension. If you want to use three-and-a-half months, three months, five-and-a-half months or otherwise, we said, okay, what are you doing about passing the test with or without an accommodation? Okay, so then I guess to the extent that that is one of the questions before the jury, the idea is the jury could have decided that if he had come back and said, actually, I need more time or I need some additional flexibility, there's no reason to assume that the school wouldn't have provided it, and then the jury could have concluded that he's the one who cut off that discussion. Is that right? Indeed, there is every reason in the world, including sitting here today, that NYIT would have done so, would have done so. And when you get into what about the prior accommodations, we could have terminated him in December of 2012. We could have terminated him in September of 2013. We could have not given him any accommodation. And secondly, this accommodation— Well, I don't know about that. I mean, you do have a— But the idea of an accommodation is that you do create an exception to a general policy, right, when somebody has a disability. What I meant by that, Judge, is in September of 2013, Baal is doing, quote, nothing, close quote, as far as school work. This is a red herring. In other words, he's failed the tests, P, E, and C, E, in September. We are in a position that if we chose to, we could have terminated him. He's not going to class. He's asking us for a medical leave of absence. He's already on two and having a capstone. We said, fine, we'll give you until January 31, 2014. And you want an accommodation from NBOE. And go get it. We never said no. And then, because of his prolix desire to sue, he gets rid of his three lawyers. Adam never makes an exception. You're saying that it was his idea to have the accommodation from the NBOME. Yes. But, in fact, the letter from Mr. Thompson in October 2013 says, NYI, you know, New York Institute of Technology will not approve Mr. Baal's application if the NBOME does not grant a testing accommodation. That may be a little ambiguous, but it was in August of 2013 that Baal said, I need an accommodation of double the time. And NBOME said no. And we said courteously, okay, if you get the accommodation and you pass, we're good. And if January 31 is not convenient for you, we'll extend this until 2025. Where did you say that last part? That was inappropriate. But it's 2025, Judge. Making up facts in the record, yes. I guess your argument was you didn't say that expressly, but you also continued to reach out so it wasn't clear that you – you also didn't say, you know, we won't consider any further discussion. To the contrary, Judge. Look at what Thompson wrote. He speaks to Mulhern. Mulhern, in furtherance of the litigation, comes in February of 2014 to look at documents. He has an email to Mulhern saying, what are you doing, Kevin? Where is this effort on Baal's part to pass the test? Incidentally, in 2015, and the judge precluded us from putting in certain evidence about additional outreach, and he refers to it in his decision. Okay, can I ask what his status is now? He's withdrawn, and it's never been changed. That's a fact. So Mr. Bergstein can guess all he wants. He has been withdrawn. That's in the record. That's a representation. I'm sorry, what does that mean? You're thinking that he withdrew from enrollment or you withdrew him? We withdrew him rather than dismiss him. We withdrew him for economic reasons so that if it was appropriate for him to come back to NYIT after having passed the MBOME test and said, can I be re-enrolled, that possibility was extinct. Doesn't he have to be enrolled in order to take the test? If he comes to us and says, if he says MBOME, and this is what's not in the record, Judge, if he says MBOME, where is his evidence that he has sought from MBOME? Wait, sorry, finish the sentence you were starting a moment ago. If he comes to you and says- If he says MBOME is going to allow me to take the test today in 2025, he can come to us and we can, of course, if we, and I'm not speaking for the school because we haven't had those discussions, but it left open that possibility that he could re-enroll and if passing the test, go further. I'm not going to speak for the school about its policies because that's not in the record or otherwise. But we left this open in 2014 in order to- So you're saying even though the October 2013 letter says that if you don't do this by the end of January 2014, we're going to dismiss you, you in fact still haven't dismissed him more than 10 years later. Yes, sir, and for good reason. How does that speak to the fact that it wouldn't have burdened you to give him exactly what he was asking for, which was- We gave him more. What didn't we give him? What didn't we give him? We gave him six months. We gave him more than six months. We gave him 12 years, Judge. Okay. January 31 came and went. It meant nothing. He didn't get an assessment from the doctor. What was January 31? He wasn't in school. He wasn't going to class. He didn't need medical aid. So I get all that. Is it possible that that is what it looks like in retrospect, that you just didn't expel him, but if he had received that letter in October 2013, he would have understood or he would have believed that January 2014 was a fixed deadline? He couldn't believe it because we spoke to three attorneys saying, what do you want to do about him and what assessment is he taking and what efforts is he making to obtain the MVOME passing? Can I ask about the trial lawyers? He's had three lawyers. He got rid of three lawyers. Okay. Thank you. I think we have an additional question. Can I just ask about the trial lawyers? Is there at least a risk of prejudice from the introduction of the evidence of Mr. Ball's marijuana use? No, because what it pertained to, Judge, was in Fiseri's notes, Salanto's notes, and otherwise. And I was very delicate about it in the court. And, in fact, I think if you go through the transcript, you'll see, I don't care what he does, but rather he was out at night fighting with his family, smoking marijuana, not attending to his studies. It's even in 2015, two years later. Why is he studying for the MVOME if he thought or was somehow precluded by NYIT from graduating or somehow not giving him a reasonable accommodation? He's attempting to take the test, or so we speak, but he never did in 2015. Okay, but just to be precise, the relevance of the marijuana use is that he might, that his difficulties might not be attributable to a disability, but to the drug use? His own physician said that. Both Yellen said that and Adler. And you, in fact, argued to the jury that there was a question about whether he was a qualified individual with a disability. Correct. Had I known, I'm sorry, Judge, had I known that he was doing marijuana use so frequently, I might not have given my assessment as I had done. And the jury concluded that he was a disabled person, so any error would have been lacking in prejudice anyway. It would not have been prejudicial in any event because they did hold him to be a qualified individual with a disability. Okay. Thank you, Mr. Catalino. Thank you. We'll hear from Mr. Bergstein again on rebuttal. I have three points. First, I want to emphasize about what the school knew in January 2014 about the workability of the timeline. Even after plaintiff brought that unworkability to everyone's attention in his OCA complaint and the dean was interviewed in June of 2014, he still said the framework was sound. They were never going to change it. Number two, the district court on this issue, on the workability of the timeline, did not dispute the unworkability, and defendants haven't disputed the unworkability either in their brief. What they're arguing was, and the district court said this too, we can consider the October 21 proposal in light of prior accommodations given to the plaintiff during his medical school career. The problem with that is twofold. The prior accommodations were not disability accommodations. And number two, I know of no case that actually stands for that. So if this court adopts that reasoning, it will be the first time any I know of. But did we have to adopt that reasoning? So it could be that the jury relied on any one of a number of theories. So the jury could have concluded what we said a moment ago, which was maybe he's the one who led to the breakdown in the iterative process. It could also be, you know, because he didn't bring to the school's attention the unworkability of it, that given what the school knew at the time, it was a reasonable accommodation. But they didn't – they were not told about the unworkability because of the three tests in a year policy. How could the school not know it was unworkable if they worked with the testing company all the time on exams and reasonable accommodations? Of course they knew. And they knew six months later they still held firm on the framework. Okay, get that. What about the iterative process possibility? The interactive process broke down because the school kept demanding that plaintiffs comply with conditions that they knew he couldn't comply with and that the district – not the district, that the medical school didn't even believe he needed an accommodation in the first place. They were not taking it seriously. What about the burden on the school of continuing this process indefinitely or without end? That – what we heard about the indefinite eligibility is outside the record. It's outside the – there's no evidence that he could take the exam today. The marijuana evidence – there are cases in our brief that highlight the danger of highlighting such evidence in a case like this. What is the prejudice? The prejudice is that it would create, to say the least, a negative impression on the jury that he was not a serious medical student. And it has no serious relevance to any of the issues. It's clear he has a number of disabilities, so that couldn't have been disputed. But you're saying it's clear that he has a number of disabilities, but that was a contested question. But the evidence on his disabilities is overwhelming. I mean, you have medical records. So maybe the school was always going to lose on that issue. I don't know. But they're still allowed to introduce argument and evidence about it. But then we're getting into 403 balancing. If there's slight relevance, it's greatly outweighed by the jury hearing. You're saying that the district court did the balancing wrong. So it was relevant to an issue that was contested. But because there was so much evidence pointing in the other direction on that issue, the district court should have excluded the evidence as being more prejudicial. I'm not conceding it was relevant, but if we argue that it's relevant. You said a moment ago that there was just lots of evidence on whether he had a disability, and so it would have been minimally relevant. Minimally, it wasn't in any way relevant. But even if it was minimally relevant, it's greatly outweighed by prejudice on the jury thinking, my Lord, here's a guy who wants to be a doctor. He's smoking marijuana in medical school. Why should we allow a person like this to become a doctor? There's no good reason to use it. And it wasn't handled delicately. If he had really adopted that and thought like he really shouldn't become a doctor or he's not qualified to be a doctor, wouldn't the jury have done what counsel for NYIT was arguing and decided based on that evidence that he was not a qualified individual? Well, what does one have to do with the other? They might have said he's not qualified to be a doctor, but they in fact decided he was qualified to be a doctor if he had had an accommodation. He's qualified with a disability, a qualifying disability. But I don't see how drug use for a medical student is going to impress a jury unless there's a good reason to bring it out. And it wasn't handled delicately at trial. It came up all during summation. They really relied on this to challenge his credibility. But didn't one of the – maybe I'm getting this wrong and you can help me correct. Didn't one of the experts say, oh, I didn't know, and if I had known, I might have revisited my conclusion? Dr. Yellen testified that if he was actively smoking a lot of marijuana at the time of presentation, I would question whether or not I was seeing ADHD or symptoms secondary to the marijuana. So why isn't that relevant? Because there was overwhelming evidence apart from that. But that also is not in summation. That's the part that I was – right? That came up before summation. Right. But in summation, they were using it to attack his character and his credibility. And how can that – how can a jury look favorably upon this? Okay. Thank you very much. Thank you. Mr. Berstein, the case is submitted.